ACCEPTED
04-12-00238-CR
FOURTH COURT OF APPEALS
SAN ANTONIO, TEXAS
3/9/2015 2:47:15 PM
KEITH HOTTLE
CLERK

No. 04-12-00238-CR

IN THE COURT OF APPEALS
FOR THE FOURTH JUDICIAL DISTRICT
OF TEXAS, AT SAN ANTONIO

FILED IN
4th COURT OF APPEALS
SAN ANTONIO, TEXAS
3/9/2015 2:47:15 PM
KEITH E. HOTTLE
Clerk

## Kimberly Saenz
Appellant

v.

## The State of Texas
Appellee

On Appeal from the 217th District Court of Angelina County
In Cause No. CR-28,665; the Honorable Barry Bryan, Judge Presiding

# State's Supplemental Brief

Submitted by:

## Art Bauereiss
District Attorney for Angelina County
State Bar No. 01921800
eMail: abauereiss@angelinacounty.net
Post Office Box 908
Lufkin, Texas 75901
(936) 632-5090 phone
(936) 637-2818 fax

Attorney for the State of Texas

| **John G. Jasuta** | **David A. Schulman** |
|---|---|
| Post Office Box 783 | Post Office Box 783 |
| Austin, Texas 78767-0783 | Austin, Texas 78767-0783 |
| lawyer1@johnjasuta.com | zdrdavida@davidschulman.com |
| Tel. 512-474-4747 x1 | Tel. 512-474-4747 x2 |
| Fax: 512-532-6282 | Fax: 512-532-6282 |
| State Bar Card No. 10592300 | State Bar Card No. 17833400 |

Of Counsel on the Brief

**Oral Argument Conditionally Requested**

# Table of Contents

Index of Authorities. . . . . . . . . . . . . . . . . . . . . . . .    ii

Identity of Parties and Counsel. . . . . . . . . . . . . . . . . . . . . iv

Statement Regarding Oral Argument. . . . . . . . . . . . . . . . . . . iv

Note About Abbreviations.. . . . . . . . . . . . . . . . . . . . . . iv

Statement of Facts & Procedural History. . . . . . . . . . . . . . .    1

Argument & Authorities.. . . . . . . . . . . . . . . . . . . . . .    3

    I. <u>Appellant Was "Caught in the Act."</u>. . . . . . . . . . . . . .    5

    II. <u>Appellant's Statements</u>. . . . . . . . . . . . . . . . . . . .    11

    III. <u>Appellant's Opportunities to Commit the Offense</u>. . .    14

    IV. <u>Substances Involved</u>. . . . . . . . . . . . . . . . . . . . .    24

        A - Not Heparin. . . . . . . . . . . . . . . . . . . . . .    24
        B - Not Renalin. . . . . . . . . . . . . . . . . . . . . .    25
        C - Not Bleach in Water. . . . . . . . . . . . . . . . . .    26
        D - Not Bleach in Dialysis Machines. . . . . . . . . . .    28
        E - Not Stress of Dialysis Treatment.. . . . . . . . . . .    29

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . .    29

Prayer. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    31

Certificate of Compliance and Delivery. . . . . . . . . . . . . . .    33

# Index of Authorities

**Texas Cases**:

***Allen v. State***, 253 S.W.3d 260 (Tex.Cr.App. 2008). . . . . . . . . . 3

***Almanza v. State***, 686 S.W.2d 157 (Tex.Cr.App. 1985). . . . 2-5

***Barrios v. State***, 283 S.W.3d 348 (Tex.Cr.App. 2009). . . . . . . 3

***Cosio v. State***, 353 S.W.3d 766 (Tex.Cr.App. 2011). . . . . . . . . 4

***Garcia v. State***, 919 S.W.2d 370 (Tex.Cr.App. 1994). . . . . . . 5

***Motilla v. State***, 78 S.W.3d 352 (Tex.Cr.App. 2002). . . . . . . . 5

***Ngo v. State***, 175 S.W.3d 738 (Tex.Cr.App. 2005). . . . . . . . . . 3

***Reeves v. State***, 420 S.W.3d 812 (Tex.Cr.App. 2013). . . . . . . . 4

***Saenz v. State***, 421 S.W.3d 725
   (Tex.App. - San Antonio 2014) . . . . . . . . . . . . . . . . . . . . . 2

***Saenz v. State***, _____ S.W.3d _____
   (Tex.Cr.App. PD-0253-14; December 10, 2014). . . . . . . . . 2

***Villarreal v. State***, _____ S.W.3d _____
   (Tex.Cr.App. PD-0332-13; February 4, 2014). . . . . . . . . . 3

***Warner v. State***, 245 S.W.3d 458 (Tex.Cr.App. 2008). . . . . . . 4

## Identity of Parties and Counsel

The parties have not changed since original submission.

## Statement Regarding Oral Argument

The State requests oral argument only if Appellant requests and is granted oral argument.

## Note About Abbreviations

In this brief, the State refers to the Clerk's Record as "CR" followed by the appropriate page: e.g., "(CR 123)." The State refers to the Reporter's Record as "RR" followed by the volume, page and line numbers: e.g., "(RR Vol. 3, P. 47, L. 12-15).

No. 04-12-00238-CR

IN THE COURT OF APPEALS
FOR THE FOURTH JUDICIAL DISTRICT
OF TEXAS, AT SAN ANTONIO

**Kimberly Saenz**
Appellant

v.

**The State of Texas**
Appellee

On Appeal from the 217th District Court of Angelina County
In Cause No. CR-28,665; the Honorable Barry Bryan, Judge Presiding

# State's Supplemental Brief

TO THE HONORABLE FOURTH COURT" OF APPEALS:

COMES NOW, the State of Texas, by and through her duly elected District Attorney, Appellee in the above styled and numbered cause, and respectfully files the State's Supplemental Brief, and would show the Court as follows:

## Statement of Facts & Procedural History

The events giving rise to the instant prosecution occurred in the DaVita HealthCare Partners, Inc. ("DaVita") dialysis facility in Lufkin, Texas, during April 2008 (RR Vol. 37, P. 25). In that

1

month, ten patients either died following cardiac arrest or developed symptoms of illness while undergoing dialysis. Appellant was indicted and charged with one count of capital murder and five counts of aggravated assault (CR Vol. 1, PP. 75-77).

On original submission the Court affirmed Appellant's conviction. *Saenz v. State*, 421 S.W.3d 725 (Tex.App. - San Antonio 2014). Appellant sought and was granted discretionary review, and, ultimately, the Court of Criminal Appeals reversed the conviction, finding that this Court erred in holding that the jury charge was not erroneous:

> Without unanimous agreement regarding a predicate murder as defined under Section 19.02(b)(1), which in this case could have been any one of the five people she was alleged to have killed, there was no foundation from which to progress to a conviction for capital murder, and the appellant's right to a unanimous verdict was violated.

*Saenz v. State*, _____ S.W.3d _____ (Tex.Cr.App. PD-0253-14; December 10, 2014)("*Saenz II*"), slip op. at 7. The Court held, however, that because Appellant had not objected to the jury charge, the trial court's error must be analyzed for egregious harm under *Almanza v. State*, 686 S.W.2d 157 (Tex.Cr.App. 1985).

The case was remanded to this Court for that purpose. ***Saenz II***, slip op. at 7-8.

## **Argument & Authorities**

Under ***Almanza***, the degree of harm required for reversal depends on whether the error was preserved in the trial court. ***Villarreal v. State***, _____ S.W.3d _____ (Tex.Cr.App. PD-0332-13; February 4, 2014); ***Ngo v. State***, 175 S.W.3d 738, 743 (Tex.Cr.App. 2005); ***Almanza***, 686 S.W.2d at 171. Where, as here, the defendant did not raise a timely objection to the jury instructions, reversal is required only if the error was fundamental in the sense that it was so egregious and created such harm that the defendant was deprived of a fair and impartial trial. See ***Almanza***, 686 S.W.2d at 171; see also ***Barrios v. State***, 283 S.W.3d 348, 350 (Tex.Cr.App. 2009).

Charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory. See ***Barrios***, 283 S.W.3d at 350; see also ***Allen v. State***, 253 S.W.3d 260, 264 (Tex.Cr.App. 2008).

Egregious harm is a "high and difficult standard" to meet, and such a determination must be "borne out by the trial record." *Reeves v. State*, 420 S.W.3d 812, 816 (Tex.Cr.App. 2013). On appeal, neither party bears the burden of showing harm or a lack thereof under this standard. *Warner v. State*, 245 S.W.3d 458, 464 (Tex.Cr.App. 2008).

A reviewing court reverses a conviction when it has found that the defendant suffered "actual rather than theoretical harm." *Cosio v. State*, 353 S.W.3d 766, 777 (Tex.Cr.App. 2011). In examining the record to determine whether charge error has resulted in egregious harm to a defendant, the Court should consider:

❶ the entirety of the jury charge;

❷ the state of the evidence, including the contested issues and weight of probative evidence;

❸ the arguments of counsel; and

❹ any other relevant information revealed by the trial record as a whole.

*Almanza*, 686 S.W.2d at 171.

The presence of overwhelming evidence supporting the finding of guilt can be a factor in the evaluation of harmless error. *Motilla v. State*, 78 S.W.3d 352, 357 (Tex.Cr.App. 2002). Additionally, under *Almanza*, where the evidence of the defendant's guilt is overwhelming, the error may be considered harmless. *Garcia v. State*, 919 S.W.2d 370 (Tex.Cr.App. 1994). In the instant case, the evidence establishing Appellant's criminal responsibility for the deaths of five victims through the unique manner and means of injecting bleach was overwhelming.

## I. Appellant Was "Caught in the Act."

The events giving rise to the instant prosecution occurred in the DaVita dialysis facility in Lufkin, Texas, during April 2008 (RR Vol. 37, P. 25). On April 28, 2008, the clinical coordinator for the DaVita dialysis facility was overseeing the scheduling of patients and employees after several adverse events to dialysis patients had occurred throughout that month (RR Vol. 37, PP. 16-25). She reassigned Appellant (a licensed vocational nurse or "LVN"

employed by DaVita) to work as a patient care technician ("PCT")[1] rather than as a medications nurse (RR Vol. 37, P. 28). Appellant was upset by the work reassignment and got teary-eyed (RR Vol. 37, PP. 30-31).

Appellant preferred to be the medications nurse rather than a PCT, which involved the more stressful work of direct patient care (RR Vol. 34, P. 64; Vol. 36, P. 129). She had previously complained and was looking for another job (RR Vol. 34, PP. 60, 63; RR Vol. 37, P. 171). She thought it was unfair that other LVNs got to give medications and she always had to take patients (RR Vol. 36, P. 54). Appellant also had complained about several specific patients (Metcalf, Strange, Few, Oates, Kelley, Rhone and Risinger) and didn't appear happy at work (RR Vol. 34, P. 99; Vol. 37, PP. 171, 203; Vol. 44, P. 14).

---

[1] PCT's do not have a medical license and can't do certain procedures without delegation by the medical director (RR Vol. 34, P. 166) The PCT creates the morning bleach solution used for cleaning up surfaces (RR Vol. 34, P. 167)

Linda Hall[2] and Lurlene Hamilton[3] (dialysis patients at the DaVita facility in Lufkin) saw Appellant obtain a syringe from the nurse's station,[4] pour bleach from a bottle[5] into a container, slide the container holding the bleach down the counter and set it on the floor, squat down to draw bleach from the container into the syringe, return the container back to the nurse's station, walk over to dialysis patient Marva Rhone, look around, push the syringe into the port hole for Rhone's medication and inject the bleach (RR Vol. 33, PP. 113-117, 191-237; Vol. 35, PP. 202-204; Vol. 36, PP. 24-25). Hall was clear that Appellant did not inject the syringe

---

[2] Hall testified at trial. In addition, a deposition of Hall and a written statement she made to the Board of Nurse Examiners were admitted into evidence (RR Vol. 33, P. 146; State's Exhibit No. 67; Deposition Exhibit No. 7).

[3] Hamilton did not testify at trial because she had died. However, her recorded deposition was admitted into evidence (RR Vol. 33, P. 180); State's Exhibit No. 68) A transcript of that deposition also was admitted into evidence, along with an earlier unsuccessful deposition (RR Vol. 34, P. 13; State's Exhibit No. 69; Defense Exhibits Nos. 4-5) Additionally, a written statement made by Hamilton was admitted into evidence (RR Vol. 33, P. 200; State's Exhibit No. 69-2 or Deposition Exhibit No. 2).

[4] For a photo of the nurse's station, see State's Exhibit No. 65 (RR Vol. 33, P. 111).

[5] For a photo of a bleach bottle used in the facility, see State's Exhibit No. 66 (RR Vol. 33, P. 111).

into Rhone's saline bag; she injected it into Rhone's IV tubing, where medication is received (RR Vol. 33, PP. 134, 137).

Appellant then placed the syringe into a Sharps container (used for the disposal of syringes)[6] located at another patient's dialysis machine rather than the container at Rhone's machine (RR Vol. 35, P. 209; State's Exhibit No. 67, PP. 31, 36, 40). Hamilton also said she saw Appellant use a syringe to inject bleach into the IV line for dialysis patient Carolyn Risinger (RR Vol. 33, P. 191).

After witnessing the event, Hall told a DaVita employee, "I saw that nurse putting something out of the bleach pan in Ms. Rhone's IV" and "It scared me to death" (RR Vol. 33, P. 116). She also told the employee, "Please don't let her touch me no more" (RR Vol. 33, P. 117). Hall was scared and upset (RR Vol. 35, P. 203). Hamilton was so upset that she said, "She is going to kill us all. She is going to kill us all" (RR Vol. 33, PP. 195-196). Hamilton was crying and scared when she reported what she saw (RR Vol. 35, P. 200).

---

[6] See State's Exhibit No. 82 (RR Vol. 34, PP. 163-165).

8

The DaVita clinical coordinator met with Hamilton and Hall, who were excited and upset (RR Vol. 376, P. 32). She listened to their description of Appellant's actions and recovered the Sharps container (RR Vol. 37, P. 35). She then confronted Appellant, who denied giving anyone any medication, but admitted drawing up a bleach mixture on the floor (RR Vol. 37, P. 35). The coordinator sent Appellant home for the day (RR Vol. 37, P. 39), then opened the Sharps container, took out a syringe, squirted out some liquid onto a bleach testing strip and watched it turn purple, indicating the presence of bleach (RR Vol. 37, P. 42).

The coordinator then got another bleach testing strip and found that the inside of the syringe tested positive for bleach (RR Vol. 37, P. 43; Vol. 41, P. 35; Vol. 42, PP. 15-17). She testified that, after two syringes tested positive for bleach, "My heart fell. I was thinking, oh, goodness" (RR Vol. 37, P. 43).

Another employee, testing syringes in another Sharps container, also had two syringes test positive for bleach (RR Vol. 37, P. 43). Subsequent lab testing confirmed the presence of

9

bleach in three of the needles (RR Vol. 38, PP. 40-43; State's Exhibit Nos. 11A, 12A  15A). The investigating officer could smell bleach on the syringes (RR Vol. 38, P. 50).

On April 29, 2008, all DaVita employees were supposed to attend a meeting (RR Vol. 36, P. 141).  Appellant was absent and told a PCT, when called, that she was not coming to the meeting even though she could lose her job (RR Vol. 36, P. 142).  The PCT later met with Appellant, who was crying and didn't recognize the PCT at first (RR Vol. 36, P. 143).  The PCT testified, "She told me that she didn't kill those people," and seemed like she had lost all the hope in the world (RR Vol. 36, PP. 144,176).

Subsequent testing by the FDA confirmed the presence of bleach in syringes connected to certain patients.  The agency then seized the DaVita facility (RR Vol. 39, PP. 137-145; Vol. 40, PP. 9-19).[7]

---

[7] For a chart listing seized syringes, the related Sharps container and the FDA lab results, see State's Exhibit No. 195 (RR Vol. 41, P. 93-95).

Subsequent forensic examination of a home computer (containing Appellant's tax returns, letters and e-mails) seized from Appellant showed that, on April 2, 2008, there had been a search through a Yahoo search engine for "bleach poisoning," leading to the location of an article on chlorine poisoning (RR Vol. 42, PP. 61-64). In addition, the examination showed searches in the first week of May 2008 for "bleach given during dialysis" and "can bleach be detected in dialysis lines" (RR Vol. 42, P. 65).

## II. **Appellant's Statements**

Appellant's recorded interview on April 29, 2008, at the Lufkin Police Department, and a transcript of that interview, was admitted into evidence (State's Exhibits 86 & 86A). During the interview, Appellant admitted taking medication for depression, and having started the medication six weeks earlier (RR Vol. 36, P. 197). Her interview was increasingly impaired, disjointed and irrational (RR Vol. 38, PP. 35-36).

During the interview, Appellant speculated that bleach in the machines was responsible for the problems at the DaVita facility

(RR Vol. 36, P. 188). Referring to how she rushed the delivery of medications, she also said, "I just have a habit of *pushing the bleach* 'cause I just – I don't know when it was last done, and I don't want to kill my patients" (RR Vol. 36, P. 189). As to the allegation that she injected something into Rhone's port, she claimed she only gave Rhone some saline solution (RR Vol. 36, PP. 199-200, 208).

Appellant explained the procedure for creating a bleach solution (RR Vol. 36, P. 201), and seemingly acknowledged that there was no reason to use a syringe to draw bleach (RR Vol. 36, P. 202). Then she claimed she sometimes used a syringe when the measuring cups were not available (RR Vol. 36, P. 203).[8]

Appellant's descriptions then become confusing (RR Vol. 36, PP. 203-206). She did deny going over to any patients on April 28,

---

[8] A PCT with 20 years of experience at DaVita said she had never seen appellant use a syringe to measure out bleach to prepare the diluted solution and would have reported it to her superiors if she had seen it, because they never used syringes in that way (RR Vol. 36, PP. 56-57). Other employees also had never seen anyone at DaVita use a syringe to create the diluted bleach solution. (RR Vol. 36, P. 128; 37, P. 172) At a team meeting, employees were told to use a measuring cup. (RR Vol. 36, P. 13).

2008, with a syringe because she was not doing any medications that day (RR Vol. 36, P. 207).

On March 31, 2009, Appellant testified before a grand jury (RR Vol. 37, P. 216). A recording and transcript of that testimony was admitted into evidence (RR Vol. 37, P. 216; State's Exhibits 93 & 93A).

During her grand jury testimony, Appellant explained that on April 28, 2008, she was flushing the dialysis machine with saline because of clotting (RR Vol. 37, P. 220). She explained that she drew up bleach in a syringe because supervisors were watching and she wanted to do everything by the book (RR Vol. 37, P. 221). She also said measuring cups were unavailable (RR Vol. 37, P. 224).[9] She claimed she poured bleach into a cap of the bottle, drew up bleach with the syringe and put the syringe in a Sharps container afterward (RR Vol. 37, PP. 225-226). Appellant did not testify at trial.

---

[9] The investigating officer testified to seeing measuring cups in the DaVita facility on April 28, 2008 (RR Vol. 38, P. 63). A PCT testified she couldn't remember the facility ever running out of measuring cups for bleach. (RR Vol. 43, P. 59).

13

## III. Appellant's Opportunities to Commit the Offense

The indictment named ten (10) victims of bleach injections. Five died and five were injured.[10] Appellant was working on *every* date that involved a bleach-related injection to a patient.

After reviewing all the records and testing results, a physician and specialist in toxicology with the Center for Disease Control concluded that the deaths and/or injuries of Rhone, Risinger, Oates, Castaneda, Bradley, Few, Kelley, Metcalf, Strange and Bryant were all caused by the injection of bleach into a dialysis line or port (RR Vol. 42, PP. 164-168). The following information details those events for each victim.

### April 1, 2008

**Clara Strange.** Strange used a central venous catheter for dialysis (RR Vol. 42, P. 107).[11] A PCT observed that appellant was assigned to watch Strange while he was on a break (RR Vol. 36, P. 119). The PCT returned from the

---

[10] For a calendar listing the names of the patients who suffered from bleach injections and the dates of those events, see State's Exhibit No. 87 (RR Vol. 70). For a calendar matching the dates of the bleach injections and appellant's scheduled working days, see State's Exhibit No. 101 (RR Vol. 38, P. 64).

[11] For details regarding Ms. Strange's dialysis treatment, see State's Exhibit No. 32.

break and found Strange was unresponsive and not breathing. Strange was transported to a hospital (RR Vol. 36, P. 120; State's Exhibit No. 27). A physician and specialist in toxicology with the Center for Disease Control concluded she died from injection of bleach into a dialysis line or port (RR Vol. 42, PP. 164-168).[12]

**Thelma Metcalf.** Metcalf went to the DaVita facility for dialysis (RR Vol. 35, P. 186).[13] She used a central venous catheter (RR Vol. 42, P. 107). A PCT observed that Metcalf became unresponsive shortly after Strange had coded (RR Vol. 36, P. 121). Appellant was the PCT assigned to Metcalf (RR Vol. 36, P. 121). An LVN saw Appellant turn down Metcalf's blood-flow rate (RR Vol. 37, P. 170). A person can reduce the likelihood of an alarm going off by turning down the blood-flow rate on the machine (RR Vol. 37, P. 206).

An employee of DaVita told Appellant to open an airway for Metcalf when doing CPR compression (RR Vol. 40, P. 60). When Appellant didn't respond, the employee took the air bag from her and took over providing air (RR Vol. 40, P. 61). Metcalf was transported to the emergency room of a hospital by ambulance (State's Exhibit No. 24). Subsequent testing of the blood tubing used in Metcalf's dialysis on April 1 showed positive for the presence of bleach (RR Vol. 39, PP. 151-152).[14] DNA testing confirmed the tubing as coming from Metcalf (RR Vol. 36, P. 76; Vol. 38, P. 62; State's Exhibit No. 84).

---

[12] For the chart listing the results of testing for the presence of bleach in Strange's blood tubing, see State's Exhibit No. 163.

[13] For details regarding her dialysis treatment, see State's Exhibit No. 33.

[14] For a color-coded diagram showing the location of bleach in that tubing, see State's Exhibit No. 160 (RR Vol. 39, P. 134).

15

Based on a review of DaVita records for Metcalf from her dialysis, a medical officer from the Center for Disease Control concluded that something caused her blood pressure to fall significantly near the time Appellant was charted as being near Metcalf (RR Vol. 42, PP. 111-112). Metcalf became unresponsive, stopped breathing and had no pulse; CPR was started and someone called 911 (RR Vol. 42, P. 113). A physician and specialist in toxicology with the Center for Disease Control concluded Metcalf died from injection of bleach into a dialysis line or port (RR Vol. 42, PP. 164-68)

## April 16, 2008

**Graciela Castaneda.** Ms. Castaneda went to the DaVita facility for dialysis (RR Vol. 35, PP. 40-41).[15] While receiving treatment, she lost consciousness and was transported to a hospital (RR Vol. 35, PP. 40-41; State's Exhibit No. 25). Ms. Castenada had heart problems and needed oxygen (RR Vol. 35, PP. 63-64). Her ongoing illnesses had impacted her memory and mental functioning (RR Vol. 38, PP. 148-149).

Subsequent testing of a plasma sample from Castaneda was positive for the high level of chlorotyrosine, confirming exposure to bleach in the blood stream (RR Vol. 39, PP. 85-87; Vol. 42, P. 149). However, testing for her blood tubes were inconclusive for the presence of bleach (RR Vol. 39, P. 153).[16]

---

[15] For details regarding Ms. Cstaneda's dialysis treatment, see State's Exhibit No. 34.

[16] For a color-coded diagram showing the results of testing on Castaneda's tubing, see State's Exhibit No. 158 (RR Vol. 39, P. 134).

16

Castaneda's blood work showed elevated LDH, suggesting bleach had been injected (RR Vol. 42, PP. 123-124; State's Exhibit No. 227). A physician and specialist in toxicology with the Center for Disease Control concluded she was injured by an injection of bleach into her dialysis tubing (RR Vol. 42, PP. 164-168).

Castaneda would chew gum during dialysis (RR Vol. 44, P. 196). Defense experts (a nephrologist and forensic pathologist) opined that Castaneda choked on her gum (RR Vol. 47, P. 100; 48, PP. 35-36).

**Garlin Kelley.** Mr. Kelley went to the DaVita facility for dialysis (RR Vol. 33, P. 170; Vol. 335, P. 120).[17] After being started on dialysis, he was doing fine (RR Vol. 36, P. 81). Appellant was his medicine nurse (RR Vol. 36, P. 82). A PCT heard Kelley's machine alarm (RR Vol. 36, P. 84), and saw Appellant about to restart his dialysis machine but told her to wait because Kelley was "just laying out. His eyes were hazed" (RR Vol. 36, P. 86).

A PCT and RN saw an unusual clot in Kelley's arterial chamber (RR Vol. 35, P. 124; Vol. 36, PP. 87-88). Kelley had a cardiac arrest and was taken to a hospital, but never regained consciousness (RR Vol. 33, P. 173; State's Exhibit No. 22).

Subsequent testing of a plasma sample from Kelley was positive for the high level of chlorotyrosine, confirming exposure to bleach in the blood stream (RR Vol. 39, PP. 80-81, 84; Vol. 42, P. 149). Subsequent testing of the blood tubing for Kelley and an attached

---

[17] For details regarding Mr. Kelley's dialysis treatment, see State's Exhibit No. 35.

syringe tested positive for the presence of bleach and chlorate (RR Vol. 39, PP. 154-155).[18] Subsequent DNA testing confirmed the blood tubing came from Kelley (RR Vol. 36, P. 76; Vol. 38, P. 62; State's Exhibit No. 84). A physician and specialist in toxicology with the Center for Disease Control concluded Kelley died from injection of bleach into a dialysis line or port (RR Vol. 42, PP. 164-168).

## April 22, 2008

**Cora Bryant.** Bryant went to DaVita facility for dialysis (RR Vol. 35, P. 190).[19] Everything seemed fine until her machine alarmed (RR Vol. 37, P. 161). A LVN saw Appellant trying to reset Bryant's machine and heard Bryant asking Appellant what medication was being given (RR Vol. 37, PP. 163, 165). Bryant then had a cardiac arrest, which meant something had to have been delivered to her (RR Vol. 37, PP. 165, 167).

The medical director had not expected her to die on dialysis, even though she had several medical issues (RR Vol. 38, PP. 152-153). Bryant was transported to the emergency room of a hospital by ambulance (State's Exhibit No. 23).

A dialysis machine will typically alarm if something is injected, such as medication (RR Vol. 37, P. 205). A person can reduce the likelihood of an alarm going off by turning down the blood-flow rate on the machine (RR

---

[18] For a color-coded diagram showing the location of bleach in that tubing, see State's Exhibit No. 161 (RR Vol. 39, P. 134).

[19] For details regarding Ms. Bryant's dialysis treatment, see State's Exhibit No. 36.

18

Vol. 37, P. 206). A LVN saw Appellant turn down Bryant's blood-flow rate (RR Vol. 376, P. 167).

Subsequent testing of a plasma sample from Bryant was positive for chlorotyrosine, confirming exposure to bleach in the blood stream (RR Vol. 39, PP. 84-88; Vol. 42, P. 149).[20] Her blood work showed elevated LDH, suggesting bleach had been injected (RR Vol. 42, PP. 123-124; State's Exhibit No. 227).[21]

Subsequent DNA testing confirmed the blood tubing came from Bryant (RR Vol. 36, P. 76; Vol. 38, P. 62; State's Exhibit No. 84). A physician and specialist in toxicology with the Center for Disease Control concluded she died from injection of bleach into a dialysis line or port (RR Vol. 42, PP. 164-168).

## April 23, 2008

**Marie Bradley.** Bradley went to the DaVita facility for dialysis (RR Vol. 35, P. 13).[22] While receiving treatment, she had an event and woke up in the hospital three and a half days later (RR Vol. 35, P. 13). Bradley had no memory of what happened to her (RR Vol. 35, P. 33). She was transported to an emergency room of a hospital by ambulance (State's Exhibit No. 21). She recovered and was doing well at the time of trial (RR Vol. 38, PP. 149-150).

---

[20] Oralia Torres was receiving dialysis only one chair away from Bryant on April 22, 2008. Blood testing on Torres was negative for chlortyrosine, suggesting that Bryant got something different during dialysis (RR Vol. 42, PP. 162-164).

[21] For the chart listing the results of testing for the presence of bleach in Bryant's blood tubing, see State's Exhibit No. 164.

[22] For details regarding Bradley's dialysis treatment, see State's Exhibit No. 37.

19

Based on a review of DaVita records for Bradley from her dialysis, a medical officer from the Center for Disease Control concluded her blood pressure dropped significantly without any real change in her heart rate or blood flow during the time that Appellant charted observing her (RR Vol. 42, PP. 113-114). Subsequent testing of a syringe labeled for delivery of the drug Zemplar to Bradley on April 23 tested positive for the presence of bleach (RR Vol. 39, PP. 143-144). Her blood work showed elevated LDH, suggesting bleach had been injected (RR Vol. 42, PP. 123-124; State's Exhibit No. 227). Subsequent testing of blood tested positive for chlorotyrosine (RR Vol. 42, P. 149). A physician and specialist in toxicology with the Center for Disease Control concluded she was injured by an injection of bleach into a dialysis line or port (RR Vol. 42, PP. 164-168).

## April 26, 2008

**Opal Few.** Few went to the DaVita facility for dialysis (RR Vol. 36, P. 45).[23] She used a central venous catheter (RR Vol. 42, P. 107). The medical director said she was lively and full of energy despite her age and medical issues (RR Vol. 38, PP. 153-154). However, she began having problems within minutes of being put on dialysis (RR Vol. 35, P. 117).

Ms. Few was unresponsive, didn't have a heartbeat and was not breathing (RR Vol. 35, P. 118). A PCT observed that Appellant didn't seem to care about Few's condition (RR Vol. 36, P. 125). Few was transported to an emergency room by ambulance (State's Exhibit No.

---

[23] For details regarding Few's dialysis treatment, see State's Exhibit No. 38.

20

20). A registered nurse recalled asking Appellant to give Few her medications just before the problems began (RR Vol. 35, P. 118). Appellant admitted to the nurse that she gave Few the medicine Zemplar but didn't document it on the computer until after being told to do so (RR Vol. 35, PP. 119, 178).

Subsequent testing of a plasma sample from Few was positive for chlorotyrosine, confirming exposure to bleach in the blood stream (RR Vol. 39, P. 87). Subsequent testing of a syringe labeled for delivery of the drug Zemplar to Few on April 26, 2008, was positive for the presence of bleach (RR Vol. 39, P. 143). Subsequent testing of the blood tubing for Few used on April 26, 2008, was positive for the presence of bleach (RR Vol. 39, PP. 145-146).[24]

Punctures in the blood tubing for Few were consistent with the use of a syringe with a 3-pointed tip (RR Vol. 40, PP. 36-37). Subsequent DNA testing confirmed the blood tubing came from Few (RR Vol. 36, P. 76; Vol. 38, P. 62; State's Exhibit No. 84). A physician and specialist in toxicology with the Center for Disease Control concluded she died from injection of bleach into a dialysis line or port (RR Vol. 42, PP. 164-168).

**Debra Oates.** Oates went to the DaVita facility for dialysis (RR Vol. 35, P. 78).[25] A registered nurse ("RN") saw Appellant administer something into Oates' blood lines and then drop a syringe into a Sharps container (RR Vol. 35, P. 180).

---

[24] For a color-coded diagram showing the location of bleach in that tubing, see State's Exhibit No. 159 (RR Vol. 39, P. 134).

[25] For details regarding Oates' dialysis treatment, see State's Exhibit No. 39.

21

Oates saw Appellant just before she started having problems, had a funny taste in her mouth and asked appellant, "What did you give me?" (RR Vol. 35, P. 88-93). Oates then became sick, began bleeding and had the sensation her bones were being crushed (RR Vol. 35, P. 79). She also had chest pain and was unable to breath (RR Vol. 35, P. 80). Ms. Oates also had signs of an anxiety attack, including a rapid heartbeat and sweating. She said she didn't feel right and that something was going on (RR Vol. 35, P. 112).

Oates also complained of nausea and vomited (RR Vol. 35, P. 113; Vol. 36, PP. 122-123). Her blood pressure dropped significantly and she was "not feeling good." (RR Vol. 42, PP. 114-115). Oates was taken to a hospital by ambulance (RR Vol. 35, PP. 79, 113; State's Exhibit No. 26). She recovered and was doing relatively well at the time of trial (RR Vol. 38, PP. 147-148).

Subsequent testing of a plasma sample from Oates was positive for a high level of chlorotyrosine, confirming exposure to bleach in the blood stream (RR Vol. 39, PP. 81-82; Vol. 42, P. 149). Her blood work showed elevated LDH, suggesting bleach had been injected (RR Vol. 42, PP. 123-124; State's Exhibit No. 227). A physician and specialist in toxicology with the Center for Disease Control concluded she was injured by an injection of bleach into her dialysis line or port (RR Vol. 42, PP. 164-168).

**Marva Rhone.** [26] A PCT put Rhone on dialysis on April 28, 2008 (RR Vol. 34, P. 49).[27] Before leaving for a break, the PCT observed that Rhone was doing fine (RR Vol. 34, P. 50). Hall and Hamilton then observed Appellant inject bleach into a port on Rhone's dialysis machine (see *supra*). Upon returning from break, the PCT noticed Rhone's blood pressure was dropping, that she appeared to squirm and looked uncomfortable (RR Vol. 34, P. 52).

Ms. Rhone became nauseated, began throwing up, became weak, had slurred speech and could hardly talk (RR Vol. 33, PP. 154-155; Vol. 35, P. 205). She reported pain along her ribs (RR Vol. 34, P. 56). Rhone went to a hospital for blood work (RR Vol. 33, P. 156), which showed elevated potassium and LDH, suggesting bleach had been injected (RR Vol. 42, PP. 123-124; State's Exhibit No. 227).[28] A physician and specialist in toxicology with the Center for Disease Control concluded she was injured by an injection of bleach into her dialysis line or port (RR Vol. 42, PP. 164-168).

**Carolyn Risinger.** During dialysis,[29] Risinger became sick (RR Vol. 35, P. 205). Hamilton observed Appellant inject bleach into a port on Risinger's dialysis machine (see *supra*). Ms. Risinger was reclined, given a cloth on

---

[26] Rhone did not testify at trial because she died in 2011 after a kidney transplant (RR Vol. 33, P. 160; Vol. 38, PP. 144-145).

[27] For details regarding Rhone's dialysis treatment, see State's Exhibit No. 30.

[28] For the chart listing the results of testing for the presence of bleach in Rhone's blood tubing, see State's Exhibit No. 162 (RR Vol. 39, P. 133).

[29] For details regarding Risinger's dialysis treatment, see State's Exhibit No. 31.

her head and received oxygen and saline (RR Vol. 34, P. 191). A physician and specialist in toxicology with the Center for Disease Control concluded she was injured by an injection of bleach into her dialysis line or port (RR Vol. 42, PP. 164-168).

The Risinger blood tubes from her dialysis machine were not turned over to police (RR Vol. 37, P. 114). In addition, blood samples from April 28, 2008, were unavailable because Risinger did not go to the hospital after her event (RR Vol. 42, P. 123; Vol. 43, P. 22).

Risinger did not testify at trial because she died from a motor vehicle accident (RR Vol. 38, P. 146). Risinger's husband testified, however, stating that neither he nor his wife saw Appellant do anything out of the ordinary and never came over to her dialysis machine (RR Vol. 43, PP. 13, 19). A PCT also testified she didn't see anyone inject anything at Risinger's dialysis chair (RR Vol. 43, P. 51). A dialysis patient, who focused on Risinger that day, didn't see Appellant do anything to Risinger (RR Vol. 43, PP. 112-114). A defense expert opined that Risinger simply suffered from high blood pressure and end-stage renal disease (RR Vol. 48, P. 41).

## IV. Substances Involved

## A - Not Heparin

The drug Heparin is used in dialysis to keep a patient's blood from clotting (RR Vol. 34, P. 138). The medical director eliminated Heparin as a cause of any problems with the ten patients at the

24

DaVita facility (RR Vol. 38, P. 161). Indeed, appellant stipulated that the Heparin used by the DaVita facility did not have any problems (RR Vol. 39, PP. 199-203; State's Exhibit No. 168). The evidence clearly showed that the substance involved was not Heparin.

## B - <u>Not Renalin</u>

Two categories of dialyzers were available for use by patients, re-use and non re-use dialyzers (RR Vol. 34, P. 140). Non re-use dialyzers were used a single time and then disposed. Re-use dialyzers were cleaned between uses by the same patient through a Renatron, which rinsed the dialyzer with processed water and cleaned it with Renalin (peracetic acid) (RR Vol. 34, P. 142).

If a patient were exposed to Renalin through a re-use dialyzer, the symptoms would begin immediately upon the initiation of dialysis and include a burning sensation in the access point, a funny breath odor, chest pains, vomiting, nausea and breathing difficulty (RR Vol. 34, P. 141). The DaVita facility stopped using

re-use dialyzers after April 16, 2008 (RR Vol. 37, P. 26; Vol. 40, P. 44).

For Metcalf, treatment records show her dialyzer was clear of Renalin (RR Vol. 37, PP. 64-65). Patients Few and Bradley did not use a re-use dialyzer (RR Vol. 37, PP. 65-66). The medical director eliminated Renalin as a cause of any problems with patients at the DaVita facility (RR Vol. 38, PP. 163-172).

## C - <u>Not Bleach in Water</u>

Throughout the trial, Appellant attempted to suggest that chlorine entered the dialysis machines through the city water used by the facility. Dialysis requires the use of processed water (RR Vol. 34, P. 143).

Water used at the DaVita facility was initially drawn from the city water supply (RR Vol. 37, PP. 49-50). However, the facility filtered out any chemicals, including chlorine (RR Vol. 34, P. 198; Vol. 37, PP. 49-50). The dialysis facility tested the water every four hours for the presence of chlorine (RR Vol. 34, P. 170; Vol. 37, PP.

51-52; Vol. 40, P. 49). Dialysis would stop if chlorine was detected (RR Vol. 34, P. 171).

The medical director eliminated chlorine break-through from the city water supply as a cause of any problems (RR Vol. 38, PP. 162-172; Vol. 39, PP. 47-49). The biomedical technician for the DaVita facility reviewed the testing logs and couldn't find a single test showing the presence of chlorine in the facility water (RR Vol. 40, P. 128). Further, a microbiologist at the Center for Disease Controls and Prevention reviewed the testing done at the DaVita facility and found the facility water did not contain chlorine (RR Vol. 41, P. 142).

Although Appellant alleged that testing was ineffective because, at one point, the facility was using a different testing packet, the manager for the company providing the testing kits confirmed that testing would, nonetheless, have detected the presence of chlorine (RR Vol. 40, PP. 113-114, 117). He concluded that the testing was reliable (RR Vol. 40, P. 123). Additionally, the senior director of technical operations for DaVita reviewed the

27

records and concluded that there was no indication of bleach or chlorine in the facility's water system during April 2008 (RR Vol. 40, PP. 158, 203-209).

## D - <u>Not Bleach in Dialysis Machines</u>

The dialysis machines were cleaned weekly (on Thursdays) with bleach (RR Vol. 34, PP. 173, 207; Vol. 36, P. 52; Vol. 37, PP. 55, 58). Using bleach test strips, the facility tested the machines for the presence of bleach (RR Vol. 34, P. 174; Vol. 36, PP. 52-53; Vol. 37, P. 56; Vol. 40, P. 47). Machines also were tested before being used by patients (RR Vol. 36, P. 54).

If bleach were present in a machine, any patient reaction would have occurred at the beginning of treatment (RR Vol. 34, P. 174). Notably, no patients had any medical events on a Friday, which would have been the first day for dialysis after machines were cleaned (RR Vol. 37, PP. 59-60; State's Exhibit No. 87). A microbiologist at the Center for Disease Controls and Prevention reviewed the testing done for bleach in the machines at the DaVita

facility and found the machines did not contain chlorine in April 2008 (RR Vol. 41, PP. 145-146).

### E- <u>Not Stress of Dialysis Treatment</u>

A defense expert witness, a nephrologist, testified he believed the medical incidents for several patients were caused by excessive fluid removal ("ultrafiltrification") and other issues (RR Vol. 47, PP. 61-105). On cross-examination, the doctor admitted that, while he could offer his opinion based on limited medical information, he ultimately didn't know the causes of death (RR Vol. 47, P. 109). A State's expert witness, another nephrologist, contradicted the defense expert (RR Vol. 48, PP. 16-45).

## <u>Conclusion</u>

That evidence included eyewitnesses who saw Appellant draw a syringe with bleach and inject it into two dialysis patients, forensic evidence confirming bleach in syringes, blood lines and the bodies of victims and expert testimony concluding that the five victims died of bleach poisoning. The defense involved focusing on alternative sources for the presence of bleach in the bodies.

29

However, the State overwhelmingly eliminated those sources through forensic testing, examination of facility records and expert testimony. No rational juror could have isolated out any particular victim who died as being supported by insufficient proof when contrasted with the other victims.

Likewise, the evidence overwhelmingly supported a finding that the five deaths occurred in the same scheme or course of conduct. The uniquely identical manner and means of causing the deaths, along with the relatively short time period between all of the deaths, supports such a conclusion. No rational juror could have thought there was insufficient evidence on the issue as to either theory.

While Appellant argues that some jurors might have grouped victims who died on a single day into the same criminal transaction, that does not mean those same jurors could rationally have had a reasonable doubt that all of the victims should be grouped into the same scheme or course of conduct. There simply is no rational basis for thinking that the five people who died in

30

the same dialysis center in the same month by the same method (injection of bleach) were not murdered in the same scheme or course of conduct.

As to instructing the jury on the need for a unanimous decision on the issues of multiple deaths and same scheme or course of conduct, there simply wasn't much for the jury to deliberate about. Given such overwhelming evidence on those elements, the trial court's error would not have impacted the deliberations and, therefore, was harmless.

## **Prayer**

WHEREFORE, PREMISES CONSIDERED, the undersigned, on behalf of the State of Texas, respectfully prays that this Honorable Court will review this brief and upon submission of the case to the Court will affirm the judgment and conviction of the court below.

Respectfully Submitted,

/s/ Art Bauereiss

**Art Bauereiss**, District Attorney
State Bar No. 01921800
eMail: abauereiss@angelinacounty.net
Post Office Box 908
Lufkin, Texas 75901
(936) 632-5090 phone
(936) 637-2818 fax

Attorney for the State of Texas


**John G. Jasuta**
Post Office Box 783
Austin, Texas 78767-0783
lawyer1@johnjasuta.com
Tel. 512-474-4747 x1
Fax: 512-532-6282
State Bar Card No. 10592300


**David A. Schulman**
Post Office Box 783
Austin, Texas 78767-0783
zdrdavida@davidschulman.com
Tel. 512-474-4747 x2
Fax: 512-532-6282
State Bar Card No. 17833400


Of Counsel on the Brief

## Certificate of Compliance and Delivery

This is to certify that: (1) this document, created using WordPerfect™ X7 software, contains 6,715 words; does not comply with Rule 9.4 (i)(3), Tex.R.App.Pro, excluding those items permitted by Rule 9.4 (i)(1), Tex.R.App.Pro., and complies with Rules 9.4 (i)(2)(B) and 9.4 (i)(3), Tex.R.App.Pro.; and (2) on March 9, 2015, a true and correct copy of the above and foregoing "State's Supplemental Brief" was transmitted via the eService function on the State's eFiling portal, to Robert Morrow (ramorrow15@gmail.com); counsel of record for Appellant, Kimberly Saenz.

/s/
_____
**Art Bauereiss**